We'll next take up 21-4102, Mahdi v. Salt Lake City Police Department. Good morning, Your Honors. May it please the Court and the Council. Who, I should add, have been really great to work with during this case. I had some personal issues that came up. They were always gracious, granted extensions, extremely professional. I really have appreciated working with them on this case. Like I said, my name is Aaron Garrett. I'm an attorney with Nonprofit Legal Services of Utah out of Salt Lake City. And we are representing Mr. Thayer Mahdi, who's the plaintiff and the appellant in this case. Mr. Mahdi moved to the United States with his family and ultimately got here in 2009. They lived in Iraq, that's where they're from, lived through a couple of wars. He was working with the U.S. military, and ultimately his family became targeted by some of the insurgency groups. They fled their home. They spent a couple of years in a refugee camp in Syria before they were finally able to come to the United States, become citizens and active members of our country and the community in Salt Lake City. When they got here, he set up a little tailoring shop in the southern part of Salt Lake City. Worked it for about 10 years until one day, absolute tragedy befell him. A truck crashed into the front of his store, and within seconds, 196, 200 bullets were fired into his shop just completely out of the blue. It was a life-changing event that he experienced, and he's a shell of himself, is what I've been told. Extremely damaging situation. And so he came to my office and we decided we'd file this claim against the police departments and some of the individual officers that were involved in the shooting. The district court decided that our proposed second amendment complaint failed to state a claim for relief because of a few legal issues that are now before the court. The first one is whether, given the facts that were alleged in the complaint, whether the court should apply a deliberate indifference standard or an intent to harm standard based on our 14th amendment claim. And the trial court said, well, this was a police chase, and normally speaking in a police chase, we apply the intent to harm standard. And we think that the trial court got it wrong and that the deliberate indifference standard should apply. The police chase lasted for approximately 20 minutes or so. There were a number of different jurisdictions, police departments that were involved in the chase. And we think that gave them enough time to figure out what they were going to do when this happened. If the question is whether they had time to deliberate, we don't really pull in that 20 minutes while they were on the chase, do we? When the time to deliberate, the issue is from the moment that the crash happened and the officers are right there on the scene because they're following him. Isn't that the moment where we question, did they have time to deliberate? Not in a 20-minute high-speed chase that occurred prior to that. I think that's fair, Your Honor. And you just said in your opening remark that that was just a few seconds, that within seconds, moments of the crash, the volley of shots and everything happens. Right. So where's the time for the officers to deliberate? Well, I think it's important for you to know that the shots were in one direction only. Mr. Robinson, who was driving the vehicle, had crashed at a high rate of speed into a building. The car was immobilized. There was no further risk of him continuing. There's no evidence or allegation that he did attempt to continue driving like in some of the other police chase cases. But he did exit the vehicle, and he obviously had access to a weapon because he was shooting it. Well, he sort of fell out of the car, I think is how I would describe it from my witnessing of the videos. We don't make allegations of that nature in the complaint, what exactly it was that he did when he crashed. But a very large police force had him entirely surrounded. And given that circumstance, that is what created an opportunity for there to be deliberation. He wasn't driving the vehicle anymore. He'd been shooting at the officers during the course of the 20-minute chase. It's true. Is it irrational for them to fear that he would shoot some more, and he needed to be disabled? They needed to be sure he was disabled? Well, I think I agree with you. I don't think it's irrational to think that. But our allegation in the complaint is that he was disabled at the point where there was the crash. But this wasn't decided on the pleadings, was it? Yes, it was. What do you mean by that? It was on a motion to... Well, didn't the court... There's a video. It's been unclear to me exactly what its status is in the record. Was it viewed by the court, the video? We included a link to the video as part of our complaint. And I believe the court did view the video as a result of our having a link to it. And the court then can consider that to the extent it's inconsistent with the pleadings. Isn't that correct? Absolutely. We included it in our complaint for the purposes of the court to consider. Absolutely. Can I follow up on Judge Moritz's question? Let's say... I've got a couple of questions. First of all, in terms of the 40 minutes or whatever it was, as I understand it, even in the allegations of the complaint, is some officers were dropping out of the chase. Some officers were interjecting themselves into the chase, correct? Yes. And then as they had allegedly time to deliberate, they also had to defend themselves because he's shooting at them, right? That's correct. But if you put all of that aside, as Judge Moritz is getting at, is once he crashes into Mr. Mulroney's tailor shop and he either falls out or exits, and the officers obviously know he has access to a weapon, and you and I and all of the four of us, or seven of us, have access to stopping and rewinding, these officers are looking at this in real time, why would it be plausible to say, well, they had time to deliberate because they knew that he had been disabled, they knew that he was no longer physically capable of continuing to shoot, even though they can see, we can all see, that he's outside of his vehicle and reaching into the vehicle, apparently. Now, everybody's view is obstructed. Presumably their views were obstructed. How could they have had an opportunity to deliberate under those unbelievable circumstances? It's hard for, I think, the officers directly on the scene to make that deliberation based on the facts that you're describing and what we argue in our complaint. The deliberation that I think I'm talking about is at a higher level in the police department. You've got this chase going on for 20 minutes, 25 minutes, however long it is. There should have been some planning about, this is going to end at some point, how are we going to handle when this chase ends, aside from how it ended up happening, which was every cop that showed up fired every bullet in there. That's the deliberation, I think, and then that needs to be conveyed to the officers on the scene. So, tell me how this works, because the higher-ups during that 20 minutes are going to prepare a decision tree, essentially. If he does this, then these officers do this, these other officers do that, and it can be a pretty complicated decision tree because there are lots of things that could happen at the end, and then that's got to be communicated to everybody. Is that conceivable? Is that really possible to do? I think, to a certain extent, it is. To an extent it is possible? Yeah, I'm not expecting that a large rubric is conveyed to all of the police officers, and they immediately process it as they're driving their cars. But I don't think it's unreasonable for the people of Salt Lake to expect that there would be some sort of plan for how this is supposed to end when it does end. Can you give me an idea of what a plan would look like? I think some kind of number of officers who are showing up, maybe if you're in the second or third row of cars, you don't need to get out your gun and start firing right away. You can be backup to the officers who were there first on the scene. Something to that extent. I only have a few more minutes, and there are, I think, some other interesting points of this case that I'd like to discuss. If this court does ultimately find that the intent to harm standard does apply in this case, which, of course, we don't think it does, but we believe the complaint still makes a claim even under that intent to harm standard. The rub on the intent to harm standard is... The way that I read the cases is that the intent to harm has been applied that... It's not necessarily... There has to be an intent to harm the innocent by state. That's the way that the district court applied the case law. And under that situation, there's essentially no innocent bystander claim, because you're not an innocent bystander if a police officer is intending to shoot you. That's too strict, I think. Well, how do you reconcile that argument with page 1158 of Childers, where we're talking about hostages making the claim, and nowhere do plaintiffs present specific facts suggesting that the officers harbored an intent to harm them, not the wrongdoers, but them, the plaintiffs, bystanders, victims. Thus, there is no constitutional liability under Lewis. How can we reconcile your theory with our precedent? Yeah, I don't think it can be reconciled, so I'm asking... I think that the court would have to change that decision. This panel can't. I appreciate that, but I'm going to make my argument and take it up as far as I can. So that's ultimately where I think the intent to harm standard issue needs to go. Unless you have any other questions, I don't have any more points to make, and I appreciate your time. My client appreciates that you're listening to his case and giving it due consideration. We appreciate your candor. Next, you, Dylan. May I please report? Cliff Peterson from the Utah Attorney General's Office. I represent the individual state officers, and I'll take five minutes. The district court got it right. The district court applied the right standard, the intent to harm standard, because deliberation was impractical, as we outlined on pages 8 to 14 of our brief. This was, in the complaint, alleged that it was one to two seconds from the crash until the shooting. The problem with plaintiffs' argument in their opening brief is essentially that they are arguing the officers should have created an opportunity to deliberate, which is not the law. That's not the standard. They said they could have fortified their position. They could have asked him, again, verbally, to throw down his weapon, which— How long can they keep shooting without doing something to check to see if the person's disabled? At the point they started shooting, they didn't have time to deliberate. Right. I don't have a problem with that. I think the law is pretty settled in your favor there. But this went on for a significant period of time, almost 200 shots. And at some point, it's got to stop, and they have to reconsider. I would think—could they have gone on shooting for five minutes? I don't think necessarily five minutes. So what's the standard there? At what point do you have to— The Supreme Court case discussed the possibility, if the officers saw clearly that the person was disabled, then you can't keep shooting. But they can keep shooting without checking? What should the law be there? What is the law there? Well, first of all, we don't know, with this set of facts and these several versions of the complaint, we don't know even exactly how many officers—15, 12, 17—we don't know exactly how many. I thought there was an investigation that showed at least 15 shots. In the complaint, sorry, talking about the complaint, it says potentially 15 officers. But that's supported by the state attorney generals, actually. Right, well, the district attorneys. District attorneys. But if each officer is trained to unload their clip, the entire clip— I mean, I don't think the case law supports that kind of inquiry. Is unloading your entire clip, as you're trained to do, minus one bullet, minus two bullets? I mean, the difficulty here is the plaintiff never tried to argue that, and never presented it, certainly in cases where we looked at it and dissected it and parsed it out in that degree. So the standard is all the officers present can unload their clips before they reconsider? No, no, no, you're wrong. That's not necessarily the standard. But in this situation, the district court looked at these facts and said this was still an emergency. So at most 20 seconds is what we're talking about for these officers, multiple officers, to shoot. And the complaint says they shot at Mr. Robeson and his vehicle. So it doesn't say—I mean, later in the complaint it says they were firing indiscriminately. That's not recognizable. The complaint clearly alleges they were shooting at Mr. Robeson. What if it were, say, a Columbus Day parade or something like that, and then there is someone who had robbed a convenience store, and he happens to be—find himself at the start of the parade, and the police department goes and surrounds the front of the parade, and they are within their rights to unload all of their clips.  And they are not shooting at the other 150 people behind the wrongdoer, but they're not stupid. They know that there's, say, 150 people that could easily be shot by one of these excess bullets. And I think that's what he's getting at, is let's say—I mean, this isn't this, you know, the robber, multiple robbers standing in front of an abandoned warehouse. He's standing in front of a tailor shop that says open, and then it's 11 o'clock in the morning. It's obvious it wasn't their intent, but they certainly knew that there is a huge risk that Mr. Amati or one of the customers in his tailor shop is going to be shot by one of these clips that maybe they are entitled to utilize and unload their clips. But on a 12B6, viewing the allegation is the most favorable to the plaintiff, even with the prism of that video. And I think on this theory, the video may help the plaintiff. Why isn't that satisfactory under even an intent to harm stand? I think Childress speaks to that. In Childress, the officers—twice on the radio, the officers knew that there was a possibility of hostages. The truck driver initially had seen some passengers besides the two bad guys. And then at one point, one of the bad guys, Daniel, the two-year-old, left the window. So that went out on the radio. So even despite knowing of the possibility of hostages, this court in Childress said there was no intent to harm the hostages. And I think this case is squarely governed. I mean, I realize you're talking about hypotheticals, so let me address that in terms of this case. This case is squarely governed, I believe, under the four corners of Childress. At some point, yes, at some point—and I realize an appellate court is looking also at other cases besides this. So you want to make sure you don't say anything that gives an officer carte blanche to even go so far as to be hypothetical in the opening brief. You're throwing a ball, which I think is probably too extreme. But in terms of your honor's hypothetical, a significant difference, of course, is here that it's unseen bystanders, unseen. Whereas there, you've got other issues to look at. You've got to look at the training of the officer. Did he clear his sight lines, his shoot lines, his whatever? I mean, there's a whole bunch of other issues that could potentially get in the way of 12b-6. But nevertheless, in terms of the governing standard, I think the state of the law says in an emergency situation— or at least the law doesn't say that you don't apply intent to harm in an emergency situation such as an active shooter. Certainly, there could be facts that go beyond that. But, again, you have to look at those specific facts. So I don't know if that answers your question. I'm not conceding that specific hypothetical because I don't know. There's probably just too many variables, too many facts to look at. And the court, for both the application of the intent to harm standard has to look at the emergency situation, but also for a second argument under the clearly established. And the Supreme Court, as this court said just two weeks ago in a different Lewis decision, the Supreme Court has said, quote, ad nauseum, has reminded us ad nauseum to not define clearly established at a high level of generality. And so you don't—in fact, these officers were acting within the confines of Childress. They were pursuing this suspect that had been shooting. And in terms of substantive due process, the Supreme Court has said the court is arbitrariness, which means you have to have conduct that is unjustified by any governmental interest. And going back to the earlier question, plaintiff never really broke it down, parsed it out in two. Could this at some point, whether it's 15 seconds, 20 seconds, three minutes, I don't know, but what point does— in shooting at the suspect? But in terms of clearly established— Be careful of your time. Oh, I'm sorry. It's not your fault, but you might not want to continue if you— We ask the court to affirm thank you for your time. Thank you, Your Honor, Your Honors, and may it please the court. My name is David Mould. I represent Salt Lake City. I'm going to first remind the court of some important factors that need to be considered as we weigh the question of whether there's a substantive due process violation. The court in Roska, which cited the Bella case— and remember, Bella is a very interesting, pretty analogous case in which a helicopter pilot is forced to be a hostage and fly a state prison convict away, and knowing that the helicopter pilot is an innocent hostage, police officers nevertheless shoot live rounds at the helicopter, potentially hitting the helicopter pilot, and that case was found not to be a substantive due process violation. The court emphasized three main factors to consider. One is the relationship between the amount of force used and the need for force in the situation. Also, the injury sustained by the Klan. And finally, whether the motives of the government actors seem to be legitimate. And when you look at this case, in light of those factors, I think it is crystal clear that the police officer's behavior in this case was appropriate. I'm going to address one point that Mr. Garrett raised in his address to the court. And he was asked, hey, how long can the police officers keep shooting? Is there any limit to, you know, when that must end? And we know the answer to that question. The answer is, under the Plumhoff case, officers are entitled to continue fire as long as there is a deadly threat still posed to them, as long as it's necessary to continue attempting to neutralize that threat. And are they allowed to close their eyes to the possibility that there's no longer a threat? No. So they can, that was my question, can they keep shooting without checking at some point? And the way you framed it, there was no obligation to check to see if there's a deadly threat. I think that's a great question, Your Honor, and I want to be clear. I think that there is an obligation on behalf of the police officers to use reasonable abilities of a police officer in the shoes, in that context, not in the calm, quiet compliance of this pleasant courtroom, but in the reality, in the heat of the moment, with adrenaline pumping, they've got to use their brains and be cognizant of the possibility that potentially the threat has been neutralized. Of course, we don't have that scenario here. Our scenario is the police officers didn't believe the threat had been neutralized. And I see we're down to— They didn't believe it when he got out of the vehicle. And then what happens next? What do we know from the complaint about what happens next? He got out of the vehicle, and I'm just cognizant— May have reached in. He may have reached in. He still posed a threat to them, according to the DA's report, which is also considered by the district court below, has been objected to. So he still posed a threat to them. And you can see that on the video that the district court— Right, that moment. And that's when all 15 officers are firing the 200— Well, approximately 195 bullets. Or 195. And one of those bullets was actually found to be Mr. Robinson's, a bullet fired by Mr. Robinson. So probably not after he cracked. But I want to be— But, I mean, this all happened, but within seconds? I mean, was there any moment where they said, All right, we can stop. Yes. Call it off. I mean, how long did that take exactly? I think the amount of shooting took about 20 seconds. Yeah, it was 20 seconds. So we don't know at what point. And plaintiffs never allege that the police officer should have known after the fifth second or after the hundredth bullet. It's never alleged at what point the shooting became excessive. And we know on your palm off, they can keep shooting until the threat is neutralized. So with that, I'm going to reserve the rest of the time for my co-counsel, Mr. Egan. To make an appearance, at least. You can introduce yourself and then sit down. May it please the court, I'd just like to address a couple of the points that the court has brought up. First, the video issue, it's in page eight of the district court's ruling. And I'd like to just read what the court said about the video, because I think it gets to this question about when do the officers need to evaluate. And the court says in page eight of the ruling, and that's docket number 50 from below, the video footage confirms that the police officers did not have time for actual deliberation. First, the video footage makes clear that Mr. Robinson was not incapacitated by the crash. To the contrary, he was able to get out of his car, presenting the risk of flight, further violence, or both. And so what you see here, and I think the critical point that we've talked about is the officers are evaluating this in real time with the history of having been shot at as they're pursuing this individual for 20 minutes through downtown Salt Lake. And from their perception, the threat has not ended. And so the Plumhoff case is right. And I agree with what Mr. Moult said, and the point that your owners have made is that at a certain point in time, you do have to deliberate. But that just was not possible here, given the threat that Mr. Robinson created and posed. And so they're reacting to that. And I clarify one thing, the video shows that the shooting occurred between, it's a seven to 20 second span. But there is not a period where the shooting stops, officers look around, he looks incapacitated, and then it starts back up. This is officers responding with the idea that this individual is shooting indiscriminately, both at them and the public. The last point, if I may, Your Honor, there's been no case cited where there's been a 14th Amendment excessive force violation with an active shooter. And I would just submit it on that. Unless you have questions for me. I don't have any questions. I'll make a comment, though. This comes before us as a constitutional violation. The case isn't that hard in that issue. But I bet 95% of the taxpayers in this area would want to compensate Mr. Motti. And I don't quite understand what's going on here. But we've tried to mediate the case, Your Honor. Well, I mean in the litigation, just independent of litigation. An innocent bystander gets a hundred bullets in his business. Yeah. It's a horrible situation. We're sympathetic to that, absolutely. Thank you, Your Honor. Case is submitted. Counsel are excused.